Lawrence R. HOLMAN and Denise L. Holman, husband and wife, Appellants (49744),

v.

ALL NATION INSURANCE COMPANY, Defendant and third party plaintiff, Appellant (49807),

v.

INSURANCE SHOPPE, 620 University Avenue, St. Paul, Minnesota, and Kenneth McIntosh, third party defendants, Respondents.

Nos. 49744, 49807.

Supreme Court of Minnesota.

Jan. 11, 1980.

Engebretson & Ulleberg and Andrew P. Engebretson, St. Paul, for Holman, et al.

Rothstein, Kaplan & Wolf and Howard L. Kaplan, St. Paul, for All Nation Ins. Co.

Cragg & Bailly and David A. Bailly, Minneapolis, for respondents.

Heard before YETKA, SCOTT and WAHL, JJ. and considered and decided by the court en banc.

WAHL, Justice.

Plaintiff Lawrence Holman, the victim of a serious one-vehicle accident, brought this declaratory judgment action against his insurer, All Nation Insurance Company. Plaintiff sought a judgment that the mandatory offer of optional coverages required by Minn.Stat. § 65B.49, subd. 6, was not made and these coverages should be imposed by operation of law, that these coverages, as well as the "no-fault" benefits should be "stacked," and that the optional underinsured motorist coverage so implied should not be offset by liability coverage. All Nation sought indemnification from Kenneth McIntosh, the insurance sales agent.

The Ramsey County District Court found that underinsured motorist benefits had not been offered but that plaintiff had failed to prove that the other optional coverages were not offered. The court ordered "stacking" of the "no-fault" benefits for plaintiff's two insured vehicles, as well as the underinsured motorist benefits added to the policy by operation of law. These imposed benefits were held to be additional to plaintiff's liability coverage. The court dismissed All Nation's complaint against McIntosh for indemnification. Both All Nation and Holman appeal from the portions of the court's determination which are adverse to them. We affirm in part, reverse in part.

Plaintiff Holman was the owner of a 1948 Ford pickup truck and a 1969 Pontiac automobile, both of which were named in a

single insurance policy issued by All Nation Insurance Company. In November 1976, Holman was seriously injured in a one-vehicle accident while a passenger in his own 1948 pickup truck. All Nation paid Holman the minimum coverage amounts on the face of his policy relating to the 1948 pickup truck: $20,000 medical expense benefits and $10,000 economic loss benefits (hereinafter "no-fault" benefits), and $25,000 bodily injury liability. It is undisputed that Holman's damages greatly exceed this figure.

The Holmans brought this declaratory judgment action. Evidence brought out in depositions and at trial concerning the communication between Holman and McIntosh when plaintiff purchased his All Nation policy indicates that Holman could recall practically nothing that had occurred at any of his meetings with McIntosh and was generally ignorant about automobile policies. Holman was unaware of the types and limits of available coverages. To him, "insurance was insurance," purchased to fulfill a statutory obligation, preferably at the lowest possible price. His understanding of his dealings with McIntosh are summed up in his statement: "I don't know if I was offered higher limits. I would say that I got the insurance I asked for."

McIntosh's recollection of the sales transactions was not much more specific. He testified that when he sold Holman his first policy with All Nation, Holman indicated he wanted to pay the lowest possible premium and that he had informed Holman "that he was receiving the minimum liability as required by state law, and medical payments; that if he wanted * * * higher coverages, he could have them but that he'd have to pay a higher premium." However, McIntosh did not explain or discuss any of the optional coverages of § 65B.49, subd. 6, in more than general terms. It was his belief that All Nation would not provide coverage beyond the minimum requirement for "high risk" insureds, such as Holman.

The insurance policy "face sheet" or "endorsement," which is marked for minimum coverage, and the insurance application form were introduced. A separate premium for uninsured motorist coverages is charged, but the premium for "no-fault" benefits is included in the basic premium rate. No space at all is provided for "writing up" underinsured motorist benefits. On the application form, an "X" had been drawn with blue ink through the entire printed list of available coverages, except for the minimum coverages required by statute.

All Nation introduced its pamphlet of rules and premium rates, which McIntosh had when he sold Holman the policy. However, All Nation had given McIntosh no specific instructions that he should make the statutorily mandated offers as its agent, nor does the record contain any evidence that All Nation directly communicated the availability of these optional coverages to Holman himself.

After this lawsuit was filed, and McIntosh named as a third-party defendant, McIntosh and Holman agreed that McIntosh would write, and Holman would sign, a letter from Holman which stated, "I was offered higher limits of liability and PIP,[1] but had rejected them because of a higher premium." Holman testified that when he signed the letter, he did not understand what "PIP" represents. The letter suggests, however, that McIntosh himself was not aware that insurance companies are required by law to offer underinsured motorists coverages, as well as "higher limits of liability and PIP."

This appeal raises the following issues:

1. Does the insured carry the burden of proof as to whether the mandatory offer of optional coverages was made?

2. Must the mandatory offer of optional coverages and its rejection be made in writing?

---

1. PIP = personal injury protection, the term which the insurance industry uses to refer to medical expense benefits. (Medical expense benefits are one of the three types of mandatorily offered optional coverages which Lawrence Holman alleges were not offered to him.)

3. Does the evidence establish that the mandatory offer of optional coverages was made?

4.. Does the rule in *Lick v. Dairyland Insurance Co.*, 258 N.W.2d 791 (1977), operate to limit underinsured motorist coverage implied by law to the amount by which such coverage exceeds the liability coverage of the underinsured motorist?

5. May no-fault coverages on two vehicles covered by one insurance policy be "stacked"?

6. Should optional coverages implied by law be "stacked"?

7. Is All Nation entitled to indemnification from Kenneth McIntosh for any coverages imposed by reason of a failure to offer the mandatorily offered supplemental coverages required by § 65B.49, subd. 6?

 1.–3. Plaintiff Lawrence Holman claims that All Nation Insurance Company failed to make him the offer of supplemental coverages mandated by Minn.Stat. § 65B.49.[2] The trial court cast the burden of proof on the plaintiff and found "[t]hat the evidence fails to show that the mandatory offers of [additional medical expense benefits and residual bodily liability coverage] were not made to plaintiff * * *." Minnesota law ordinarily requires that the party who must allege a given fact also has the burden of proving it. *See Ertsgaard v. Bowen*, 183 Minn. 339, 237 N.W. 1 (1931). However, we are persuaded that the statute before us requires that the insurer meet the initial burden of proving that it did make the mandatory offer of coverages to its insured, rather than requiring the insured to prove the negative of that proposition. The means of proving that the mandatory offer was made are peculiarly within the insurer's control. The insurer keeps records of its sales transactions and has a much better understanding of the often complex language of the insurance industry. Furthermore, the beneficiaries of an auto insurance policy are likely to be survivors of the insured, who may have no knowledge of events surrounding the purchase of the policy. Considerations of fairness gravitate in favor of forcing the insurer to demonstrate that he did in fact make the statutorily-mandated offers. *See Rustad v. Great Northern Railway Co.*, 122 Minn. 453, 142 N.W. 727 (1913); 9 J. Wigmore, *Evidence*, § 2486 at 275 (3rd ed. 1940).

---

2. Section 65B.49, subd. 6, provided in relevant part as follows:

Mandatory offer; added coverage. Reparation obligors shall offer the following optional coverages in addition to compulsory coverages:

(a) Medical expense benefits subject to a maximum payment of $10,000;

(b) Medical expense benefits subject to a maximum payment of $20,000;

(c) Residual liability coverage of not less than $25,000 for damages for injury to one person in any one accident arising out of the maintenance or use of a motor vehicle, subject to a limitation of $50,000 for damages arising out of any one accident;

 * * * * * *

(e) Underinsured motorist coverage whereby subject to the terms and conditions of such coverage the reparation obligor agrees to pay its insureds for such uncompensated damages as they are legally entitled to recover on account of a motor vehicle accident because the total damages they are legally entitled to recover exceed the residual liability limit of the owner of the other vehicle, to the extent of the residual liability limits on the motor vehicle of the person legally entitled to recover or such smaller limits as he may select less the amount paid by reparation obligor of the person against whom he is entitled to recover. His reparation obligor shall be subrogated to any amounts it pays and upon payment shall have an assignment of the judgment if any against the person to the extent of the money it pays.

A threshold question in this controversy is whether the language of § 65B.49, subd. 6, requires insurers simply to provide the optional coverages if they are sought, or whether insurers must make the insureds aware of the availability of the coverage. An earlier version of this statute required insurers to "make available" the optional coverages. Construing that earlier version in *Jacobson v. Illinois Farmers Insurance Co.*, 264 N.W.2d 804 (Minn.1978), this court assumed that the insurer must take some steps to inform its insureds about the availability of the optional coverage. If anything, the change in the language to "shall offer" makes this assumption more tenable. Section 65B.49, subd. 6, imposes a positive obligation on insurers to make their insureds aware of the availability of the optional coverages.

Our decision in *National General Insurance Co. v. American Standard Insurance Co.*, 311 Minn. 415, 249 N.W.2d 453 (1977), demonstrates that this court will strictly scrutinize circumstances in which an insured is said to have rejected optional coverages. In *National General*, we construed a provision of Minnesota auto insurance law which required that all insurance policies contain certain minimum levels of uninsured motorist coverage unless lower limits were selected by the insured in writing. Minn.Stat. § 65B.22 (1971). Under such a statute, we held, the writing itself must demonstrate that the insured's selection of lower limits was knowing, mindful, and intentional, and that no such knowing selection was manifested by an insurance application form on which the spaces provided for insertion of lower policy limits were left blank. While the statute which we construed in *National General* differs substantially from the one under which the Holmans seek to recover, the case does demonstrate the strictness with which we will enforce the burdens which the legislature has imposed on insurers.

All Nation argues that our decision here is controlled by *Jacobson v. Illinois Farmers Insurance Co.*, 264 N.W.2d 804 (Minn.1978), where we construed an earlier version of the section at issue in this action which required that insurers "make available" to their insureds certain supplemental coverage, including underinsured motorist coverage. In *Jacobson*, plaintiff, who was in an accident with another driver who carried only minimum liability coverage, sued his own insurer, charging that it had failed to make underinsured motorist coverage available to him. Jacobson compared underinsured motorist coverage with uninsured motorist coverage, arguing that equally weighty policy considerations led to the inclusion of each as coverages mandated in some way by the legislature. The court found the legislative placement of the opt-in/opt-out burden for each of the two types of coverage of critical importance:

* * * As previously described, Minn. St.1969, § 72A.149, made *un*insured motorist coverage automatic unless a policy-

holder opted out and rejected it. Minn. St.1971, § 65B.25 reverses this burden for *under*insured motorist coverage * *. Thus, unless a policyholder takes affirmative action to opt in and accept the newly offered coverage, he will not receive it. 264 N.W.2d at 807.

Although this language strongly indicates that the burden will be on the insured to demonstrate that he accepted underinsured motorist coverage, the *Jacobson* opinion makes it just as clear that the insurer must introduce some evidence that such coverage was offered. We noted that Illinois Farmers had introduced testimony which described in detail the mechanized mailing process utilized to inform Illinois Farmers' policyholders of the availability of new coverage. The trial court in that case found specifically that the plaintiff had either seen or overlooked the "stuffer." 264 N.W.2d at 806. The "stuffer" was a "commercially reasonable" way of notifying its insureds about the additional optional coverages. *Id.* at 808. The implicit conclusion, that the insurer must introduce sufficient evidence of its efforts to offer the supplementary coverages to its insured, is particularly sound in light of the fact that § 65B.49, subd. 6, now requires that insurers shall not merely "make available" the optional coverages but "shall offer" them.

■ Plaintiff urges that we read into § 65B.49, subd. 6, a requirement that the making of the mandatory offer must be proved in writing. We decline to do so. While the changed language in § 65B.49 reflects a firmer legislative policy in favor of the additional coverages, it still makes no requirement that offers be made or rejected in writing.

■ Evidence adduced by All Nation at trial includes the application form on which a large "X" had been drawn through all of the optional coverages available for purchase. This "X" did not persuade the trial court, nor does it persuade us, that underinsured motorist coverage was in fact offered by All Nation. It is at best ambiguous evidence that other offers of optional cover-

ages required by § 65B.49, subd. 6, were in fact made and rejected. The same observation can be made about the rules and rates pamphlet distributed by All Nation to its agents. Moreover, the record does not indicate that Holman himself ever saw this pamphlet.

All Nation notes that Holman told McIntosh that he "wanted to spend as little as possible for his policy of insurance." However, such a desire is characteristic of all insurance customers. All Nation's observation does not meet plaintiffs' argument that no real offer was made because McIntosh admittedly never told Lawrence Holman what specific amounts of optional coverages were available for what specific premium prices. Even an insurance customer who asks for the minimum coverage might decide to buy additional coverage if told that the additional protection could be had at a minimal cost. The evidence fails to establish that an offer of any of the optional coverages was made. We, therefore, read these optional coverages into the Holman policy by operation of law.

■ 4. We must next determine whether the rule in *Lick v. Dairyland Insurance Co.*, 258 N.W.2d 791 (1977), operates to limit underinsured motorist coverage implied by law to the amount by which such coverage exceeds the liability coverage of the underinsured motorist, as All Nation urges.

The accident giving rise to the *Lick* rule occurred in 1974. With the enactment of the Minnesota No Fault Act (effective January 1, 1975), plaintiff argues that application of the *Lick* rule would mean that underinsured motorist coverage is uncollectable by persons who carry underinsured motorist coverage in an amount equal to the minimum liability coverage required. This would be so because the No Fault Act requires all Minnesota motorists, including out-of-state drivers, to be protected by an insurance plan meeting minimum Minnesota requirements. Minn.Stat. § 65B.48, subd. 1. Any driver not carrying such coverage is deemed "uninsured." Minn.Stat. § 65B.49, subd. 4(3). Thus, if the *Lick* rule applies to accidents occurring after January

1, 1975, a driver who carries underinsured motorist coverage in an amount equal to the minimum liability coverage required, if hit by another driver carrying either no liability coverage at all or only the minimum required, can collect no underinsured motorist benefits at all. He will recover only uninsured motorist benefits. Yet the legislature has mandated that underinsured motorist coverage be offered to every insured in an amount equal to the minimum liability coverage.

As if in response to this dilemma, two days prior to oral argument in *Lick*, the legislature passed an amendment which changed § 65B.49, subd. 6(c), removing all the language on which the *Lick* court relied:

CHAPTER 266–S.F.No.1338

An act relating to automobile insurance; clarifying certain ambiguous provisions in the Minnesota no-fault automobile insurance act; amending Minnesota Statutes 1976, Section 65B.44, Subdivision 3; 65B.49, Subdivisions 4 and 6; 65B.51, Subdivision 1; and 65B.53, Subdivision 1.

\* \* \* \* \* \*

Sec. 3. Minnesota Statutes 1976, Section 65B.49, Subdivision 6 is amended to read:

\* \* \* \* \* \*

(e) Underinsured motorist coverage *offered in an amount at least equal to the insured's residual liability limits and also at lower limits which the insured may select*, whereby ~~subject to the terms and conditions of such coverage~~ the reparation obligor agrees to pay ~~its insureds for such uncompensated~~ damages ~~as they are~~ *the insured is* legally entitled to recover on account of a motor vehicle accident *but which are uncompensated* because the total damages ~~they are legally entitled to recover~~ exceed the residual liability limit of the owner of the other vehicle; ~~to the extent of the residual liability limits on the motor vehicle of the person legally entitled to recover of such smaller limits as he may select less the amount paid by reparation obligor of the person against~~

whom he is entitled to recover. ~~His~~ *The* reparation obligor ~~shall be~~ *is* subrogated to any amounts it pays and upon payment ~~shall have~~ *has* an assignment of the judgment if any against the other person to the extent of the money it pays. * *.
Laws 1977, ch. 266 § 3.

The 1977 amendment suggests what the legislature originally meant by the admittedly ambiguous language of § 65B.25 (now, § 65B.49). Because the No Fault Act makes offers of underinsured motorist coverage meaningless for certain persons, and because the act quoted above was designed to "clarif[y] certain ambiguous provisions" of the No Fault Act, the 1977 amendment concerning recovery may be read into the underinsured motorist section for accidents occurring after January 1, 1975. *See Gudvangen v. Austin Mutual Insurance Co.,* 284 N.W.2d 813 (Minn.1979). We hold that the *Lick* rule is inapplicable for accidents occurring after the effective date of the No Fault Act. Lawrence Holman is entitled to recover underinsured motorist benefits in addition to bodily injury liability benefits to the extent of his damages.

■ 5. All Nation argues that plaintiffs should not be permitted to "stack" the basic economic loss coverages for the two vehicles they owned, because both vehicles were covered by one policy of insurance. We cannot accept this contention. Lawrence Holman paid premiums for the basic economic loss coverages required by the Minnesota No Fault Act for both vehicles. The fact that the premiums which he paid are not separately listed in the policy is insignificant. Separate premiums for each vehicle are listed, and Minnesota law requires that an insurance policy be purchased for each vehicle and that each such policy contain such coverages. *Wasche v. Milbank Mutual Insurance Co.,* 268 N.W.2d 913 (Minn.1978). That two vehicles are listed by an insurer on a single policy has no impact on the legislature's mandate that "no-fault" benefits be provided for every vehicle registered in Minnesota.

6. All Nation contends that even if optional coverages are implied by law, "stacking," which was ordered in *Wasche* and in *Van Tassel v. Horace Mann Mutual Insurance Co.,* 296 Minn. 181, 207 N.W.2d 348 (1973), for mandatory coverages, would not be appropriate. In *National General Insurance Co. v. American Standard Insurance Co.,* 311 Minn. 415, 249 N.W.2d 453 (Minn. 1977), decided under a provision of Minnesota law which required that mandatory uninsured motorist benefits be equal to the insured's liability coverage unless lower limits were requested in writing, this court found that no such request had been made and implied the full uninsured motorist coverage by force of law. "Stacking" was held proper, in spite of the fact that the insured had not paid a premium for the full coverage. 311 Minn. at 418, 249 N.W.2d at 456.

■ It is true that underinsured motorist coverage is not required to be included in the policy, as uninsured motorist coverage is. However, once the supplemental coverages have been offered and accepted, the insurer may not, under Minnesota law, refuse to "write them up" and provide them to its insured. Furthermore, the declared policy of this court is that first-party coverages will be stacked in order of their closeness to the risk, to the amount of damages. *Integrity Mutual Insurance Co. v. State Auto & Casualty Underwriters,* 307 Minn. 173, 239 N.W.2d 445 (1976). We hold that the mandatorily-offered coverages, which are implied by law in the Holman policy, may be stacked, to the amount of Holman's damages.[4]

■ 7. Lastly, All Nation appeals the dismissal of its complaint against Kenneth McIntosh for indemnification. All Nation, by defending the suit on the merits, conced-

---

4. Although the fact that Lawrence Holman paid no premiums for the imposed coverages does not persuade us that those coverages should not be "stacked," we trust that Holman is willing, as a matter of commercial courtesy, to pay the modest amount of premiums earned and unpaid, at All Nation's request. *See Norby v. Bankers Life Co.,* 304 Minn. 464, 474, n. 7, 231 N.W.2d 665, 671 (1975).

ed its liability to the Holmans for McIntosh's acts. It argues, however, that if the mandatory offers were not made, McIntosh is liable to indemnify it because an agent is responsible to his principal for loss resulting from his own negligence. *Lunderberg v. Bierman*, 241 Minn. 349, 63 N.W.2d 355 (1954).

McIntosh testified that he had attended a seminar on the new no-fault statute in 1975 and that he was obliged to comply with Minnesota law as All Nation's agent. There is no evidence that McIntosh contracted to make the mandatory offers of optional coverage, however, and there is no evidence in the record, other than the rules and rates pamphlet which describes all available coverages, that All Nation gave McIntosh any specific direction regarding such offers. To the contrary, the record reveals that McIntosh was unaware of All Nation's obligations under § 65B.49, subd. 6. Although early Minnesota cases have held agents liable for failure to carry out specific instructions of insurers, *see Royal Insurance Co. v. Clark*, 61 Minn. 476, 63 N.W. 1029 (1895); *Hanover Fire Insurance Co. v. Ames*, 39 Minn. 150, 39 N.W. 300 (1888); *Phoenix Insurance Co. v. Pratt*, 36 Minn. 409, 31 N.W. 454 (1887), these cases are not authority for holding McIntosh liable to All Nation, where McIntosh was under no specific instructions. Thus, All Nation's negligence, not McIntosh's, was the proximate cause of All Nation's imposed liability. We affirm the trial court's denial of indemnification.

For the reasons set out above, we hold that Lawrence Holman's policy of insurance with All Nation should be reformed to provide the following coverages:

Coverage as Written:

| $ 25,000 | bodily injury liability coverage |
|---|---|
| 40,000 | medical expense coverage ($20,000 minimum, "stacked") |
| 20,000 | economic loss coverage ($10,000 minimum, "stacked") |

Coverage Imposed:

| $ 25,000 | residual bodily liability coverage (§ 65B.49, subd. 6(c) coverage) |
|---|---|
| 40,000 | medical expense benefits ($20,000 § 65B.49, subd. 6(b) coverage, "stacked") |
| 100,000 | underinsured motorist coverage (in an amount equal to $25,000 of face liability coverage, plus $25,000 imposed liability coverage, totaling $50,000 § 65B.49, subd. 6(e) coverage, "stacked") |

Affirmed in part, reversed in part.